### DUN et al. v. CITY NAT. BANK OF BIRMINGHAM.

(Circuit Court of Appeals, Second Circuit.   October 17, 1893.)

#### No. 85.

1. PRINCIPAL AND AGENT — FRAUDULENT REPRESENTATIONS OF SUBAGENT — MERCANTILE AGENCIES.

A mercantile agency which contracts with its subscribers to communicate, on request, information as to the financial responsibility of merchants and manufacturers throughout the United States and Canada, expressly stipulating that the information is to be obtained mainly by subagents of its subscribers, whose names are not to be disclosed, and that the "actual verity or correctness of the said information is in no manner guarantied," is not liable for loss occasioned to a subscriber by the willful and fraudulent act of a subagent in furnishing false information.   51 Fed. Rep. 160, reversed.

2. SAME.

Under such circumstances, the rule that, where one of two innocent persons must suffer by the wrongful act of a third person, the principal who has placed the agent in the position of trust should suffer, rather than the stranger, has no application.

Error from the Circuit Court of the United States for the Southern District of New York.

At Law.   Action by the City National Bank of Birmingham, Ala., against Robert G. Dun, Erastus Wiman, Arthur J. King, and Robert Dun Douglass.   Verdict and judgment for plaintiff, and new trial denied.   See 51 Fed. Rep. 160.   Defendants bring error. Reversed.

W. W. McFarland and Douglass & Minton, for plaintiffs in error.
Lorenzo Semple and Roger Foster, for defendant in error.

Before WALLACE and LACOMBE, Circuit Judges, and TOWNSEND, District Judge.

TOWNSEND, District Judge. The defendants are partners, doing business as a mercantile agency, under the firm name of R. G. Dun & Co. The plaintiff is a national bank, located at Birmingham, Ala. In April, 1889, the plaintiff became a subscriber to said agency, under a written agreement, the material portions of which are as follows:

"Terms of Subscription to the Mercantile Agency.

"Memorandum of the agreement between R. G. Dun & Co., proprietors of the mercantile agency, on the one part, and the undersigned, subscribers to the said agency, on the other part, viz.:

"The said proprietors are to communicate to us, on request, for our use in our business, as an aid to us in determining the propriety of giving credit, such information as they may possess concerning the mercantile standing and credit of merchants, traders, manufacturers, etc., throughout the United States and in the dominion of Canada. It is agreed that such information has mainly been, and shall mainly be, obtained and communicated by servants, clerks, attorneys, and employes, appointed as our subagents, in our behalf, by the said R. G. Dun & Co. The said information to be communicated by the said R. G. Dun & Co. in accordance with the following rules and stipulations, with which we, subscribers to the agency as aforesaid, agree to comply faithfully, to wit: (1) All verbal, written, or printed information communicated to us, or to such confidential clerk as may be authorized by us to receive the same, and all use of the Reference Book, hereinafter named, and the notification sheet of corrections of said book, shall be strictly confidential, and shall never, under any circumstances, be communicated to the persons reported, but shall be exclusively confined to the business of our establishment. (2) The said R. G. Dun & Co. shall not be responsible for any loss caused by the neglect of any of the said servants, attorneys, clerks, and employes in procuring, collecting, and communicating the said information; and the actual verity or correctness of the said information is in no manner guarantied by the said R. G. Dun & Co. The action of said agency being of necessity almost entirely confidential in all its departments and details, the said R. G. Dun & Co. shall never, under any circumstances, be required by the subscriber to disclose the name of any such servant, clerk, attorney, or employe, or any fact whatever concerning him or her, or concerning the means or sources by or from which any information so possessed or communicated was obtained. (3) The said R. G. Dun & Co. are hereby requested to place in our keeping, for our exclusive use, a printed copy of a Reference Book, containing ratings or markings of estimated capital and relative credit standing of such business men, as aforesaid, prepared by them or the servants, clerks, attorneys, and employes aforesaid, together with notification sheet of corrections. We further agree that upon the delivery to us of any subsequent edition of the Reference Book, the one now placed in our hands shall be surrendered to them, and also that upon the termination of our relations as subscribers the copy then remaining in our hands shall be given up to the said R. G. Dun & Co., it being clearly understood and agreed upon that the title to said Reference Book is vested and remains in said R. G. Dun & Co."

Plaintiff paid $75 in advance for services to be rendered under said agreement till July 1, 1890. Shortly after the making of said agreement, one Rollins, a customer of the plaintiff, applied to it to discount certain drafts drawn by him, and accepted by W. A. Kitts, of Oswego, N. Y. Before discounting the drafts, the plaintiff presented an inquiry slip at defendants' agency, at said Birmingham, asking, as a subscriber, for such information as defendants had respecting the standing and responsibility of said Kitts. The inquiry was sent from Birmingham to the office of defendants in

New York city, and thence to one Burchard, their agent at Oswego, N. Y. Burchard and Kitts were connected in business, and Burchard, in order, apparently, to promote his own interests, sent false reports as to the standing and responsibility of Kitts to the defendants. These reports were pasted on printed forms, and delivered by defendants to the plaintiff. Said printed forms were as follows:

"The Mercantile Agency of R. G. Dun & Co., Dun, Wiman & Co., and E. Russell & Co.

"The information given on this sheet is an answer to an inquiry made by a subscriber to the mercantile agency, who asks for the same as an aid to determine the propriety of giving credit. The information is communicated under the conditions of an agreement signed by the said subscriber, which expressly stipulates that the said information is obtained by the servants, clerks, attorneys, and employes of the said subscriber, and on his behalf. The said agreement also expressly stipulates that the said mercantile agency shall not be responsible for any loss caused by the neglect of any of the said subscriber's servants, clerks, attorneys, and employes in procuring, collecting, and communicating the said information; and the actual verity of the said information is in no manner guarantied. The agreement further provides that the information thus communicated shall be strictly confidential, shall never be communicated to the persons to whom it refers, and that all inquiries made shall be confined to the legitimate business of the subscriber's establishment."

The plaintiff, relying on said reports, discounted the acceptances of said Kitts to the amount of $5,264.46, which have never been paid, and are of no value. The plaintiff thereupon brought an action at law for damages by reason of said false and fraudulent representations, and the jury rendered a verdict in favor of the plaintiff. The defendants moved for a new trial, which motion was denied, and the case comes before this court upon a bill of exceptions.

The defendants' counsel, at the close of the testimony, moved the court to direct a verdict in favor of the defendants, which motion was denied. Among other requests, they requested the court to charge the jury as follows:

"If Burchard knew the reports to be false in any respect, and, so knowing them to be false, made them to the defendants, to advance, promote, or carry out some private end of his own in connection with his agency and the duties thereof, then the defendants are not liable for his false reports, and are not liable to the plaintiff by reason thereof."

The court refused so to charge, but charged the jury as follows:

"The contract between the plaintiff and defendants in regard to the reciprocal obligations of the two parties to a certain extent has been placed in evidence. It is stated in the contract that the information is to be mainly obtained by the servants, clerks, and employes appointed by the defendants, and characterized in the contract as appointed by the R. G. Dun & Co., as the subagents of the plaintiff. For any loss occasioned by the neglect of these employes in seeking and obtaining accurate information Dun & Co. are not responsible. For losses occasioned by the indolence or carelessness of the employe, which causes the information to be inaccurate, Dun & Co., are not liable. Neither do they guaranty the actual truth or correctness of the information. But, notwithstanding that these employes are the subagents of the persons who seek the information, they are also employed by, and are paid by, and are legally, as well as in popular language, the agents of Dun & Co. For losses occasioned by the willful fraud, and not by the mere care-

lessness or ignorance of the agents in communicating information known by them to be untrue, and with intent to mislead the inquirer, the defendants are liable if the plaintiffs, having placed reliance upon the fraudulent misrepresentations, gave credit in consequence of such fraud, and were lured thereby to their pecuniary loss and damage.

"In this case the business of the firm of R. G. Dun & Co. was to furnish information to subscribers who had employed them for that purpose for a pecuniary consideration. If, in the discharge of the duties of an employe, and in undertaking to furnish information in reply to an inquirer, and acting in the business of the agency, Mr. Burchard knowingly gave false information with intent to deceive the inquirer, the defendant is liable, although Burchard's private inducement to commit the fraud was desire to help Kitts.

"The questions of fact in any contested case become at least three in number:

"(1) Were the statements untrue at the time they were made?

"(2) Were they known by the agent to be untrue at the time, and did he then act fraudulently, with intent to mislead the inquirer, for that he knew that the information was sought for the purpose of aiding the inquirer to determine the propriety of giving credit to the person inquired about, is palpable? and

"(3) Did the plaintiff, relying upon the truth of the information, give credit upon the faith of the untrue representations and thereby incur a loss?"

The briefs and arguments of counsel on the appeal were largely devoted to a discussion of the liability of an innocent principal for the frauds and deceit of his agent, causing damage to a third party. That the decisions are not altogether harmonious must be conceded, but the apparent conflict is one not as to the principle, but as to its application. As is said by the learned judge who heard the cause in the court below, "the cases turned upon the question whether the alleged agent was, under the circumstances in each case, acting within the scope of his authority." And the law laid down in said cases seems generally to be, as is stated by him in his opinion, denying the motion for a new trial, "that the principal is liable whenever his agent, who is at the time acting within the scope of his authority, and for the principal, makes a fraudulent misrepresentation which influences and is acted upon by the plaintiff to his injury." Most of the decisions relied on by counsel for plaintiffs were rendered in cases where an agent was intrusted by his principal to effect a sale, and where it appeared that the principal had ratified the act of the agent by having accepted and retained the benefit derived from the fraudulent representations of the agent, acting for the principal. In the other cases, notably that of Railroad Co. v. Schuyler, 34 N. Y. 30, the deceit was practiced by an officer of a corporation. But, as is said by Mr. Justice Miller in Pollard v. Vinton, 105 U. S. 12, referring to the Schuyler Case:

"Whatever may be the true rule which characterizes actions of officers of a corporation who are placed in control as the governing force of the corporation, which actions are at once a fraud on the corporation and the parties with whom they deal, and how far courts may yet decide to hold the corporations liable for such exercise of power by their officers, they can have no controlling influence over cases like the present. In the one before us it is a question of pure agency, and depends solely on the power confided to the agent. In the other case the officer is the corporation for many purposes. Certainly a corporation can be charged with no intelligent action, or with entertaining any purpose, or committing any fraud, except as this intelli-

v.58F.no.1—12

gence, this purpose, this fraud, is evidenced by the actions of its officers. And while it may be conceded that for many purposes they are agents, and are to be treated as the agents of the corporation or of the corporators, it is also true that for some purposes they are the corporation, and their acts as such officers are its acts. We do not think that case presents a rule for this case."

A careful examination of the agreement between the parties and of their respective rights and obligations thereunder, shows that Burchard, the agent of plaintiff and of defendants, did not stand in the same relation to the parties as the agents in the cases referred to. There was no contract between plaintiff and defendants for a sale of commercial paper. This is not a case of deceit in a sale, where an agent, within the scope of his authority, and acting for his principal, has made false statements, or suppressed the truth, to effect the contract of sale. The agreement in the case at bar was purely and simply an agreement by defendants to transmit information to subscribers who might wish to contract with outside parties. The defendants, as proprietors of the mercantile agency, agree to communicate such information as they may possess, as an aid to the subscribers in determining the propriety of giving credit, such information to be mainly obtained and communicated by subagents. Defendants are not to be responsible for loss by negligence of such subagents, "and the actual verity or correctness of the said information is in no manner guarantied."

A consideration of the objects which the parties respectively had in view in connection with the provisions of the agreement seems to show that it could not have been intended that Dun & Co. should be responsible in a case like the present. They were expressly exempted from any obligation to disclose the sources of information. It was not intended that they should themselves obtain information, but it was agreed that they should transmit to the inquirer information, necessarily obtained, mainly by subagents, concerning which they had no knowledge, and over the obtaining of which they had no control. They were engaged in the preparation of a reference book containing ratings of estimated capital and relative credit standing of business men throughout the United States and Canada. While the subagents appointed by Dun & Co. were their agents in the preparation of said book, and the general business of the agency, they were, by the express terms of the agreement, subagents, appointed on behalf of the subscribers, to obtain and communicate information in response to their requests. In this case the defendants were the agents of the plaintiff to transmit such information as they might receive. Their failure to transmit the information would have been a violation of their agreement. They did transmit it, together with a notice that they did not in any manner guaranty its truth. So far as these defendants are concerned, they completely fulfilled the terms of their contract with the plaintiff. They did nothing more nor less. The deceit and fraud were committed by the subagent. It is not claimed that there was any negligence either in his selection or in the transmission of the information by the defendants. The false information was not obtained for Dun & Co. to aid them in

a contract to sell or buy commercial paper, for Dun & Co. were not a party to any such contract, but was furnished by the subagent for the purpose of having it transmitted to the plaintiff, his real principal, through the defendants, who acted as intermediary agents, in order that, by the fraud of said subagent, Kitts, one of the parties to the contract of the sale of the paper, might be assisted, and the other party, this plaintiff, might be defrauded. To accomplish this purpose the subagent perpetrated a fraud upon the plaintiff and the defendants. Burchard was not employed as the agent of either party in reference to the contract of sale which he caused to be effected by his deceit. He was only an agent under the agreement of subscription to furnish information.

The vital distinction upon which the question turns is to be found in the fact that neither the defendants nor Burchard were parties to the contract in which the alleged fraud was committed. That contract was between one Rollins, a customer of the plaintiff, and the plaintiff, for a sale of his commercial paper to the plaintiff. Burchard did not know to whom the information was to be furnished. Neither he nor the defendants knew the terms of the proposed contract, or the parties to it, or even that such contract was to be made. They had no means of knowing the amount involved in the proposed transaction between Rollins and the plaintiff, and no opportunity to protect themselves from liability for false information. No case has been cited where a stranger to a contract has, under such circumstances, been held liable for damages for fraud. The reason, apart from the exemption provided for by the subscription agreement, would seem to be that, as the defendants had no knowledge, and no notice of the character of the transaction, and were not parties or privies thereto, they could not be expected to assume any liability, except for negligence or fraud, provided they transmitted such information as they possessed, in accordance with the terms of the contract.

But plaintiff's counsel claim that defendants are estopped to make these claims, because, although they were innocent, yet the plaintiff has acted on the faith of these representations, to its prejudice. They seek to apply to this case the principle that, where one of two innocent persons must suffer for the wrongful act of a third person, the principal who has placed the agent in the position of trust should suffer, rather than the stranger. But here the plaintiff was no stranger. The subagent was his agent as well as the agent of the defendants. He was the subscriber to an agreement which from its character implied, and in its terms expressed, that the defendants could not and did not insure in any manner the verity of information to be furnished. By the use of the terms "the actual verity," etc., "is in no manner guarantied," they provide for exemption from liability for untruthful information from whatever cause, whether received through the fraud of an outsider or of the subagent. The irresistible inference to be drawn from the agreement seems to be that the accuracy of the information is to be at the risk of the subscriber.

In Friedlander v. Railroad Co., 130 U. S. 425, 9 Sup. Ct. Rep.

570, where an innocent purchaser of a bill of lading, fraudulently issued by one Easton, the station agent of the defendant, sought to hold it liable thereon, Mr. Chief Justice Fuller, referring to the principle above stated, says:

"Easton, disregarding the object for which he was employed, and not intending by his act to execute it, but wholly for a purpose of his own and of Lahnstein, became particeps criminis with the latter in the commission of the fraud upon Friedlander & Co., and it would be going too far to hold the company, under such circumstances, estopped from denying that it had clothed, this agent with apparent authority to do an act so utterly outside the scope of his employment and of its own business. The defendant cannot be held on contract as a common carrier, in the absence of goods, shipment, and shipper; nor is the, action maintainable on the ground of tort. 'The general rule,' said Willes, J., in Barwick v. Bank, L. R. 2 Exch. 259, 265, 'is that the master is answerable for every such wrong of the servant or agent as is committed in the course of the service and for the master's benefit, though no express command or privity of the master be proved.' See, also, Limpus v. Omnibus Co., 1 Hurl. & C. 526. The fraud was in respect to a matter within the scope of Easton's employment or outside of it. It was not within it, for bills of lading could only be issued for merchandise delivered; and, being without it, the company, which derived and could derive no benefit from the unauthorized and fraudulent act, cannot be made responsible. British Mut. Banking Co. v. Charnwood Forest Ry. Co., 18 Q. B. Div. 714."

In this latter case Lord Esher, master of the rolls, says:

"But, although what the secretary stated related to matters in which he was authorized to give answers, he did not make the statements for the defendants, but for himself. He had a friend whom he desired to assist, and could assist by making the false statements, and, as he made them in his own interest, or to assist his friend, he was not acting for the defendants. The rule has often been expressed in the terms that to bind the principal the agent must be acting 'for the benefit' of the principal. This, in my opinion, is equivalent to saying that he must be acting 'for' the principal; since, if there is authority to do the act, it does not matter if the principal is benefited by it. I know of no case where the employer has been held liable when his servant has made statements, not for his employer, but in his own interest."

See, also, Pollard v. Vinton, supra.

There is another aspect of the case which leads to the same conclusion. It appears from the agreement that the services demanded by the principal—the obtaining of information—cannot be rendered by the agent, but must be mainly rendered by subagents. In such cases the agent will not be liable for the negligence or misconduct of his subagent, provided there was no negligence in his selection. 1 Amer. & Eng. Enc. Law, 394, and cases cited; Story, Ag. 224. The rule is stated by Judge Dewey in Warren Bank v. Suffolk Bank, 10 Cush. 585, as follows:

"Where the nature of the business in which an agent is engaged requires for its proper and reasonable execution the employment of a subagent, the principal agent is not responsible for the defaults of the subagent, provided a proper subagent was selected. This latter rule was sanctioned and applied by this court in Fabens v. Bank, 23 Pick. 332; Dorchester Bank v. New England Bank, 1 Cush. 177."

When the business intrusted to an agent is to be performed at a distance, or requires or justifies the delegation of an agent's authority to a subagent who is not his own servant, the original agent

is not liable for the errors or misconduct of the subagent if he has used due care in his selection. Darling v. Stanwood, 14 Allen, 507; Dorchester Bank v. New England Bank, supra; Barnard v. Coffin, 141 Mass. 37, 6 N. E. Rep. 364.

In the case at bar the inquiry in Birmingham, Ala., for information as to the standing of a person in Oswego, N. Y., necessarily required the employment of a subagent in the latter place. The plaintiff, under its subscription agreement, authorized the employment of a subagent to obtain such information. In collecting special information the subagent was acting in consequence of the special request of the plaintiff, and he was the agent of the plaintiff, selected by the defendants in accordance with a rule fixed by the subscription agreement. The defendants did not undertake to do this part of the business; they declined to do it, but agreed that they would transmit the information so obtained to the plaintiff.

For these reasons we think the court erred in that portion of his charge to the jury in which he stated that "for losses occasioned by the willful fraud and not by the mere carelessness or ignorance of the agents in communicating information known by them to be untrue, and with intent to mislead the inquirer, the defendants are liable, if the plaintiffs, having placed reliance upon the fraudulent misrepresentations, gave credit in consequence of such fraud, and were lured thereby to their pecuniary loss and damage."

The judgment is reversed.